UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KELLIE B.,[1]

      Plaintiff,                      Case No. 1:22-cv-11213

v.                                  Magistrate Judge Kimberly G. Altman

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

## OPINION AND ORDER
## ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 16, 20)

### I.     Introduction

This is a social security case. Plaintiff Kellie B. brings this action under 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security (Commissioner) denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act (the Act). The parties consented to the undersigned's jurisdiction, (ECF No. 13), and the case was referred to the undersigned for all proceedings, including

---

[1] Consistent with guidance regarding privacy concerns in Social Security cases by the Judicial Conference Committee on Court Administration and Case Management, this district has adopted a policy to identify Social Security plaintiffs only by their first names and last initials. *See also* Fed. R. Civ. P. 5.2(c)(2)(B).

1

entry of a final judgment under 28 U.S.C. § 636(c), (ECF No. 23). Both parties
have filed motions for summary judgment, (ECF Nos. 16, 20).

For the reasons set forth below, Plaintiff's motion, (ECF No. 16), which
seeks a remand, will be GRANTED; the Commissioner's motion, (ECF No. 20),
will be DENIED; and the case will be REMANDED for further proceedings
consistent with this Opinion. Specifically, the Administrative Law Judge (ALJ) is
directed on remand to properly evaluate the treating opinion of William T.
Gunther, D.O. (Dr. Gunther) in light of the medical evidence.

## II.     Background

### A.     Procedural History

Plaintiff was 48 years old at the time of her alleged onset date of December
30, 2017. (ECF No. 12-5, PageID.316, 320). She completed her high school
education in 1988 and has previously worked as a caregiver and scheduler. (ECF
No. 12-6, PageID.347, 374). Plaintiff alleged disability due to diverticulitis,
hypertension, and degenerative disc disease (DDD). (*Id*., PageID.346).

After Plaintiff's applications were denied at the initial level, (ECF No. 12-4,
PageID.187-219), she timely requested an administrative hearing, which was held
on January 21, 2021, before the ALJ, (ECF No. 12-2, PageID.90-128).

Plaintiff offered the following testimony at the hearing.

Plaintiff last worked in 2016. She was a caregiver for Comfort Care Senior

2

Services before shifting to a scheduler position due to her back issue.  (*Id.*, PageID.93).  The scheduler position was "more like a desk job," but she also traveled to deliver supplies.  (*Id.*, PageID.93-94).  That job required her to lift boxes that weighed around ten pounds and drive them to clients' houses.  (*Id.*, PageID.94).  She would make deliveries roughly once per week, but eventually had to stop because lifting the boxes was too painful.  (*Id.*, PageID.95).  On delivery days, she would spend the entire day lifting boxes and delivering them.  (*Id.*, PageID.100).  While in the office, Plaintiff was required to sit for long periods of time.  She was eventually let go because she could not perform the duties of the job without taking too many breaks.  (*Id.*, PageID.96).

Plaintiff hurt herself at work in December 2017 while working as a caregiver and attempting to lift a patient.  (*Id.*, PageID.101).  Almost two years later, in October 2019, Plaintiff underwent a spinal fusion.  (*Id.*, PageID.102).  Since the fusion, Plaintiff remains in pain twenty-four hours a day from her calves to her neck.  She has trouble sleeping and feels achy despite taking pain pills.  (*Id.*).  She is limited to ten to fifteen minutes of standing or walking unassisted.  (*Id.*, PageID.102-103).  She estimated that she could lift a bag of potatoes or a gallon of milk, but that carrying two gallons of milk would be out of the question.  (*Id.*, PageID.103).

Plaintiff also complained of side effects from her medications.  They cause

3

drowsiness, constipation, and forgetfulness.  (*Id*., PageID.104).  She has trouble remaining engaged while watching television due to her pain and concentration issues.  (*Id*., PageID.104-105).  As for sleep, she gets three to four hours at night and sleeps off and on during the day.  (*Id*., PageID.105).  Due to her medical conditions, Plaintiff cannot do housekeeping, cook for her children, or do laundry. (*Id*., PageID.106).

Responding to the ALJ's questioning, Plaintiff stated that the spinal fusion was supposed to be an overnight stay in the hospital, but she had painful muscle spasms that required her to stay for five days.  She could not stand or sit during that time.  After the surgery, she had no relief.  (*Id*., PageID.107).  She had a number of steroid injections to attempt to alleviate her back pain, but these all occurred before her spinal fusion.  She also reported trying physical therapy both before and after the surgery, with a break due to COVID-19.  (*Id*.).

Plaintiff has also had issues with her hands and fingers.  Her hands are often tingling and become numb a lot.  This started before her spinal fusion, and she has had a steroid injection in her right hand to treat it, but this caused her index finger to lock and become very painful.  (*Id*., PageID.108).  She had an EMG that she recalled showing moderate carpal tunnel, but doctors did not recommend surgery on her arms or hands for the condition.  (*Id*., PageID.108-109).  Her hands are affected bilaterally.  (*Id*., PageID.109).

4

Regarding her back pain, the surgeon could not determine why she was still in pain after her surgery and that "everything looked good." He referred her to a rheumatology doctor to attempt to explain her pain. (*Id*., PageID.110-111). She explained that she is able to sit for about twenty or twenty-five minutes before needing to change positions. (*Id*., PageID.113). She is able to drive on good days, but often cannot because her legs are aching. Specifically, it hurts her lower back to move her right foot up and down. (*Id*., PageID.114).

On April 9, 2021, the ALJ issued a written decision finding that Plaintiff was not disabled. (*Id*., PageID.67-52). On April 8, 2022, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (*Id*., PageID.52-58). Plaintiff timely filed for judicial review of the final decision. (ECF No. 1).

## B.    Medical Evidence

Plaintiff saw John Traylor, M.D. (Dr. Traylor) on December 23, 2016, complaining of pain in her lower back and legs. (ECF No. 12-7, PageID.1197). She reported that the pain began "1-5 years ago" and described it as achy, dull, and sharp. Associated complaints were weakness, poor sleep, and muscle spasms, and the pain was continuous, aggravated by lying down, but improved with medications, sitting, and rest. Treatments including narcotics, muscle relaxants, and nonsteroidal anti-inflammatories provided Plaintiff with moderate relief. (*Id*.).

On examination, Plaintiff had a gait within normal limits, intact strength in the lower extremities, but painful lumbar rotation and extension with positive straight leg raises, on her right leg more so than her left. (*Id.*, PageID.1198). Dr. Traylor assessed Plaintiff as having lumbar radiculopathy, lumbar disc herniation, obesity, and spondylosis of the lumbar region without myelopathy or radiculopathy. (*Id.*). Plaintiff had "90% and 100% relief" after right lumbar facet blocks (injections of anesthesia). (*Id.*).

In February 2017, the Plaintiff underwent radiofrequency lesioning of the L3-L5 branch nerves on the right side. (*Id.*, PageID.1236-1237). She also saw Dr. Traylor on February 28, 2017, complaining of severe pain that was worse than her last visit. (*Id.*, PageID.1200). She reported "4/10" pain on average and "10/10" pain at its worst, and that while her medications provided moderate relief, the onset of that relief was poor. (*Id.*). Dr. Traylor found that her spine was "mildly provocative with extension and right lateral side bending," with no tenderness to palpation and negative straight leg raises bilaterally. (*Id.*). She was seen by a different doctor, Alexander Ajiouni, M.D., on April 21, 2017, who found normal results upon examination but positive straight leg raises bilaterally. (*Id.*, PageID.1204).

Plaintiff then underwent a lumbar steroid injection in May 2017, and again in July 2017. (*Id.*, PageID.1238-1240). She also saw Jeffrey Kirouac, M.D. (Dr.

6

Kirouac) on July 18, 2017, reporting the same level of pain and associated symptoms as in her prior visits. (*Id*., PageID.1206). On examination, Dr. Kirouac found that her gait was within normal limits, strength intact in the upper and lower extremities, and other normal results, including negative straight leg raises. (*Id*., PageID.1207). Plaintiff reported an 80% benefit after her July injection, and Dr. Kirouac reviewed the results of an MRI of her left shoulder with her. (*Id*., PageID.1208). Dr. Kirouac ordered a follow up visit in four weeks, but Plaintiff did not return until December 5, 2017. (*Id*.).

At the December 5, 2017 visit, Plaintiff described her pain as a "10/10" on average, located in the neck, lower back, and both legs. (*Id*., PageID.1209). Dr. Kirouac examined her, finding full range of motion of her left shoulder and normal results, except for positive Spurling's test[2] on the left, and positive straight leg raises on the right. (*Id*., PageID.1210). Plaintiff returned to Dr. Kirouac on January 9, 2018, reporting "6/10" average pain levels in her lower back. The pain was improved since December 2017, but still continuous, radiating into both legs, and associated with "urgency with bladder [and] constipation at times." (*Id*., PageID.1212). Her examination yielded normal results other than positive straight

---

[2] The Spurling's test "is used during a musculoskeletal assessment of the cervical spine when looking for cervical nerve root compression[,]" which can cause cervical radiculopathy. https://www.physio-pedia.com/Spurling's_Test (last visited August 2, 2023).

leg raises in her right leg.  (*Id*., PageID.1213).  Dr. Kirouac refilled her prescription of 600 mg Gabapentin to be taken three times a day and referred her for neurosurgical evaluation.  (*Id*., PageID.1214).  Plaintiff underwent lumbar steroid injections in December 2017 and January 2018, as well.  (*Id*., PageID.1239-1240).

Plaintiff returned to Dr. Kirouac on July 17, 2018 with similar complaints and was found to have positive straight leg raises in both legs.  (*Id*., PageID.1215-1216).  She underwent a lumbar steroid injection two days later.  (*Id*., PageID.1241).  She saw Dr. Kirouac again on October 29, 2018 with similar complaints, and again had positive straight leg raises in both legs, in addition to provocation in the lumbar spine with extension and rotation bilaterally.  (*Id*., PageID.1218-1220).  Plaintiff had another steroid injection on November 5, 2018. (*Id*., PageID.1242).

Later that month, on November 28, 2018, Plaintiff saw Dr. Kirouac with similar complaints, but noting an improvement in pain from the last visit, noting "0/10" pain on average with "10/10" pain at its worst.  (*Id*., PageID.1221).  On examination, she had had positive straight leg raises in both legs and provocation in the lumbar spine with extension and rotation bilaterally.  (*Id*., PageID.1223). Plaintiff had similar complaints and examination results in February, March, May, and August of 2019.  (*Id*., PageID.1224-1235).  She also received steroid injections in February, April, June, and August of that year.  (*Id*., PageID.1229, 1244-1246).

8

On May 9, 2019, Plaintiff underwent an MRI and an x-ray of the lumbar spine to assess spinal stenosis. (*Id*., PageID.1193, 1195). The MRI showed transitional anatomy at the lumbosacral junction and small to moderate central disc protrusion at L5-S1, "which probably contacts the descending S1 nerve roots," and moderate bilateral foraminal narrowing in the same area, with both being greater on the right than the left. The rest of her spine was unremarkable. (*Id*., PageID.1193). Her x-ray showed moderate disc space height loss at L5-S1 with "vacuum phenomenon and mild endplate osteophytes." (*Id*., PageID.1195).

On October 14, 2019, Plaintiff presented to a neurosurgery clinic with "severe progressive back pain that was intractable to conservative treatment." (*Id*., PageID.1153). She underwent a posterior spinal fusion at L5-S1. The procedure was completed without complications, and she reported improvement in her back and leg pain afterward. She was discharged on October 17, 2019. (*Id*., PageID.1154).

On January 9, 2020, Plaintiff saw a new provider, Hazem Eltahawy, M.D. (Dr. Eltahawy). (ECF No. 15-1, PageID.3218). Plaintiff presented with right hip pain, trouble walking, hand numbness, and lower back pain that is always present. (*Id*.). She also complained of increased frequency of urination. (*Id*., PageID.3221). She rated her pain at "6-7/10," a similar figure to pre-surgery, and was currently taking Norco, tramadol, gabapentin, and Flexeril for pain. (*Id*.). She

implied that her medications did not help, stating she thought her "body [was] immune to these pills." (*Id*.).

Dr. Eltahawy noted that Plaintiff ambulated with a cane, and upon examination found her reflexes to be limited ("2/4" on both sides on all measures), but that compression tests and seated straight leg raising tests were negative on both sides. (*Id*., PageID.3222). He found no tenderness of the lumbar spine, with fully intact motor strength. He assessed Plaintiff with degenerative lumbar spinal stenosis without neurogenic claudication. He noted that her hand numbness could be related to carpal tunnel, that she had diminished reflexes throughout, and that she was "still in the healing phase after her lumbar fusion." (*Id*.). He was hopeful that she would continue to improve with time. (*Id*.).

On January 23, 2020, Plaintiff saw Dr. Gunther who noted that her history of conservative therapies including epidural injections had failed to decrease her pain. (ECF No. 12-8, PageID.1600). He also noted that she ultimately required a lumbar fusion, which had also not resulted in a decrease in her pain. She presented disability paperwork for Dr. Gunther to fill out as well. (*Id*.). On examination, Dr. Gunther found that Plaintiff had a positive Spurling's test, positive Hoffman's sign on the right,[3] some right arm weakness, limited abduction in both legs, some

---

[3] "A positive Hoffmann's sign is suggestive of corticospinal tract dysfunction localized to the cervical segments of the spinal cord." https://www.physio-pedia.com/Hoffmann%27s_Sign (last visited August 2, 2023).

weakness in both legs, and an abnormal gait, "heavily favoring [her right leg] with cane[.]" (*Id.*, PageID.1604). He assessed full clinical weakness and poor function status and found that her examination was more consistent with cervical radiculopathy rather than carpal tunnel. (*Id.*, PageID.1606). He prescribed cervical physical therapy to be added to Plaintiff's current regimen. (*Id.*).

On January 29, 2020, Plaintiff presented for physical therapy. (ECF No. 15-1, PageID.3490). She complained of lower back and neck pain ever since her workplace incident involving a patient falling on her. She described her pain as "different" after her spinal fusion and stated the pain in her legs decreased after surgery but has since returned. She also complained of right cervical pain that radiated into her right hand but noted that her wrist brace decreased the pain. She reported her current pain level as "7/10," noting that it can be as low as "5/10" or as high as "10/10." She further stated that typically got six hours of sleep at night but would be woken up by pain. She also had an increase in urination, would trip over her right foot, and would feel pain in her right hip when flexing it. She was taking tramadol, Flexeril, and gabapentin for pain. (*Id.*).

Objectively, Plaintiff displayed a forward head position when viewed laterally; she had approximately 60% of normal flexion with complaints of bilateral hamstring tightness and lower back pain; 100% of normal extension but with complaints of pain; lower back tightness and pain with side bending; "4+ out

11

of 5" strength, limited reflexes, and positive straight leg raises. (*Id*.). She had a

positive Faber test[4] with reported tenderness to palpation of the lower back, right

greater than left. (*Id*.). Her prognosis was rated as fair. (*Id*., PageID.3491).

On May 20, 2020, Plaintiff was seen by Annie L. Craib, D.O. (Dr. Craib).

(ECF No. 12-11, PageID.2690). Her complaints were similar to those to her

physical therapist, and her physical therapy had ended in February 2020 due to the

COVID-19 pandemic. She was taking tramadol, Flexeril, and gabapentin, and

planned to return to her back surgeon in July 2020. (*Id*.). Dr. Craib noted that

Plaintiff wore wrist braces at night and was using a cane in her right hand for

ambulation. (*Id*., PageID.2691). On examination, Plaintiff had an antalgic gait

with use of her cane and limited reflexes, but negative straight leg tests, full

sensation, and full range of motion. (*Id*., PageID.2693). Dr. Craib noted that she

wore a back brace at the time of examination. (*Id*.). Plaintiff also had positive

Tinel's signs[5] bilaterally in her wrists and mild muscle wasting in the right thenar

eminence, but full strength in both wrists. (*Id*.).

---

[4] "The FABER test is used to identify the presence of hip pathology by attempting to reproduce pain in the hip, lumbar spine or sacroiliac region. The test is a passive screening tool for musculoskeletal pathologies, such as hip, lumbar spine, or sacroiliac joint dysfunction, or an iliopsoas spasm." https://www.physio-pedia.com/FABER_Test (last visited August 2, 2023).

[5] Tinel's test is used to test for compression neuropathy, commonly in diagnosing carpal tunnel syndrome. https://www.physio-pedia.com/Tinel%E2%80%99s_Test (last visited August 2, 2023).

Plaintiff had an EMG on June 1, 2020, which revealed moderate right and mild left median mononeuropathy at the wrists consistent with carpal tunnel syndrome.  (ECF No. 12-10, PageID.2615).

Plaintiff saw Dr. Craib again on June 17, 2020, and at that time had slightly decreased grip strength in her right hand, but full and equal muscle strength and full Thenar eminence.  (*Id*., PageID.2685).  Plaintiff complained of back and leg pain as well, but had noted improvement in those areas, was no longer using a cane for ambulation, and took Norco sparingly.  (*Id*., PageID.2683).  It does not appear that Dr. Craib conducted a physical examination of Plaintiff's spine or legs, only noting a full range of motion in all extremities.  (*Id*., PageID.2685).

On September 28, 2020, Plaintiff saw Molly Kucera, D.O. (Dr. Kucera), complaining of numbness and tingling in her fingers.  (*Id*., PageID.2662).  Dr. Kucera noted Plaintiff's history of lumbar fusion and that she needed a refill of pain medication and had a follow up with her surgeon next month.  (*Id*.).  On examination, Plaintiff had positive Tinel's signs on the right hand, no Thenar atrophy, positive Phalen's Test,[6] full strength of the lower extremities, but limited reflexes.  (*Id*., PageID.2665).  Plaintiff received a corticosteroid injection for her right sided carpal tunnel syndrome.  (*Id*., PageID.2667).

---

[6] Another test for carpal tunnel syndrome.  *See* https://www.physio-pedia.com/Phalen%E2%80%99s_Test (last visited August 2, 2023).

On November 23, 2020, Plaintiff saw Steven Portney, M.D. (Dr. Portney) for persistent back pain.  (ECF No. 15-1, PageID.3460).  She stated that her epidural injections had been less helpful recently and that she tried physical therapy but it exacerbated her symptoms.  (*Id*.).  Dr. Portney reviewed a lumbar CT scan from October 1, 2020, which revealed no major abnormality.  (*Id*.).  Dr. Portney examined Plaintiff, finding slight discomfort on palpation of the trapezius muscles and limited reflexes, but otherwise normal results.  (*Id*., PageID.3462).  He assessed her as having low back pain with no persistent improvement.  (*Id*., PageID.3463).  He noted that her MRI was essentially normal and that she had no pain on palpation of the lumbar spine.  (*Id*.).

III.    Framework for Disability Determinations (the Five Steps)

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

14

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps. . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Hum. Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Plaintiff was not disabled under the Act. At Step One, the ALJ found that Plaintiff had not

engaged in substantial gainful activity since her alleged onset date.  (ECF No. 12-2, PageID.70).  At Step Two, the ALJ found that she had the severe impairments of spine disorder with lumbar fusion at L5-S1 on October 14, 2019, bilateral carpal tunnel syndrome (CTS), and obesity.  (*Id*.).  At Step Three, the ALJ found that none of Plaintiff's impairments met or medically equaled a listed impairment.  (*Id*., PageID.71).

The ALJ then assessed Plaintiff's RFC, concluding that prior to October 14, 2019, she was capable of performing light work with the following additional limitations.

> [S]he must avoid work at unprotected heights or around dangerous, moving machinery; no climbing of any ladders, ropes or scaffolds; had the ability for occasional climbing of ramps or stairs; occasional balancing, stooping, kneeling, crouching; no crawling; no driving in the course of employment or use of foot controls; must avoid concentrated exposure to dust, fumes, odors, humidity, or wetness; and no exposure to temperature extremes; no concentrated exposure to vibrations; had the ability for frequent handling and frequent fingering bilaterally.

(*Id*., PageID.72).

The ALJ concluded that after October 14, 2019, the date Plaintiff underwent the lumbar fusion surgery, she was restricted to sedentary work with same additional limitations as above.  He also found that Plaintiff "requires a sit/stand option that would allow [her] to perform the work either sitting or standing and allowing for a change in position every thirty minutes."  (*Id*., PageID.77).

At Step Four, the ALJ found that Plaintiff could perform her past relevant

16

work as a scheduler.  (*Id.*, PageID.79-81).  As a result, the ALJ concluded that Plaintiff was not disabled under the Act.  (*Id.*, PageID.81).

## IV.    Standard of Review

A district court has jurisdiction to review the Commissioner's final administrative decision under 42 U.S.C. § 405(g).  Although a court can examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial review is constrained to deciding whether the ALJ applied the proper legal standards in making his or her decision, and whether the record contains substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 224-225 (6th Cir. 2019); *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) (same), *aff'd sub nom. Biestek v. Berryhill*, 139 S. Ct. 1148 (2019).

An ALJ's factual findings must be supported by "substantial evidence."  42 U.S.C. § 405(g).  The Supreme Court has explained:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence, this Court has said, is more than a mere scintilla.  It means—and means only—such

17

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (cleaned up).

In making "substantial evidence" the relevant standard, the law preserves the judiciary's ability to review decisions by administrative agencies, but it does not grant courts the right to review the evidence de novo. *Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) (" 'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.' " (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009))). An ALJ's factual findings are therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them. *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The court must " 'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (internal quotation marks and citation omitted). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be

18

upheld where the [Social Security Administration (SSA)] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (internal quotation marks and citations omitted).

## V.    Analysis

Plaintiff argues that the ALJ did not properly consider a treating source opinion, leading to a deficient RFC; that the RFC contained discrepancies and inconsistencies; that the ALJ's Step Four findings regarding past work failed to consider the composite nature of Plaintiff's job; and that the Commissioner being only removable for cause violates constitutional separation of powers, rendering decisions from ALJs that derive their authority from the Commissioner constitutionally defective.  Each issue is addressed in turn below.

### A.    Treating Physician Opinion

Plaintiff first argues that the ALJ failed to properly assess the treating source opinion of Dr. Gunther, which led to an RFC that did not fully incorporate Plaintiff's disabling impairments.

#### 1.    Legal Standard

When evaluating a medical opinion, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record."  20 C.F.R. §

404.1520c(b).  The ALJ evaluates the persuasiveness of the medical opinions and prior administrative medical findings by utilizing the following five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors.  § 404.1520c(c).  Supportability and consistency are the most important factors and the ALJ must explain how he considered these factors in his decision.  § 404.1520c(b)(2).

### 2. Dr. Gunther's Opinion

As noted above, the record contains an assessment and examination of Plaintiff by Dr. Gunther that occurred on January 23, 2020.  (ECF No. 12-8, PageID.1600).  He noted that Plaintiff's conservative treatment regimen had failed to provide relief from pain, requiring a lumbar fusion surgery, but that the surgery had also not decreased her pain.  (*Id*.).  On examination, he found positive Spurling's test, positive Hoffman's sign on the right, some right arm weakness, limited abduction in both legs, some weakness in both legs, and an abnormal gait, "heavily favoring [her right leg] with cane[.]"  (*Id*., PageID.1604).  He assessed full clinical weakness and poor function status and recommended physical therapy.  (*Id*., PageID.1606).

Dr. Gunther completed a treating source statement for Plaintiff that day as well.  He indicated that he or his colleague, Dr. Craib, had seen Plaintiff "every 3-6 months since" March 2018, providing treatment for her post-lumbar fusion

symptoms and hypertension during that time. (*Id*., PageID.1253). In Dr. Gunther's medical opinion, Plaintiff would be off task at work (limited from performing even simple work-related tasks) over 25% of the time in a typical workday. She would also likely be absent as a result of her impairments or treatment more than five times per month. (*Id*.).

Dr. Gunther indicated that Plaintiff could rarely lift, could only occasionally carry weight under ten pounds, and could never lift or carry more than that. He also opined that Plaintiff could only sit for two hours, stand for one hour, and walk for one hour in an eight-hour workday. She would need the option to sit or stand at will, as well. (*Id*., PageID.1254). He further opined that she required the use of a cane to ambulate effectively. (*Id*.). Next, Dr. Gunther found that Plaintiff could never reach overhead with either arm; could only occasionally do other reaching, handling, pushing, and pulling with her right arm or hand; and could frequently perform fingering and feeling with her right hand. (*Id*., PageID.1255). She could not do any of these activities with her left arm or hand, which he noted was not her dominant side. (*Id*.). Based on Plaintiff's decreased strength in both legs and mild hyperreflexia of the right leg, Dr. Gunther opined that she could continuously use foot controls on the left, but rarely do so on the right. (*Id*.). For postural activities, he assessed that Plaintiff could occasionally climb stairs and ramps, never climb ladders and scaffolds, and could rarely be required to balance on the job but never

21

be required to stoop, kneel, crouch, or crawl.  (*Id*., PageID.1255-1256).  She could

frequently rotate her head and neck, but could not "continuously" do any of these

tasks.  (*Id*., PageID.1256).

Finally, Dr. Gunther assessed Plaintiff's environmental limitations.  He

found that she could never work at unprotected heights or with moving mechanical

parts; rarely operate a vehicle; only occasionally tolerate humidity, wetness, and

extreme cold; frequently work in extreme heat or with vibrations; and continuously

work with dust, odors, fumes, or other irritants as may be required in some work.

(*Id*.).

### 3.  Supportability and Consistency

The undersigned finds that there are issues with the ALJ's assessment of the

objective medical record that detract from the weight afforded to Dr. Gunther's

medical opinion, specifically on the supportability and consistency factors.

The ALJ leans heavily on Plaintiff's "noncompliance" with orders from

various doctor's office visits to "return in four weeks."  (ECF No. 12-2,

PageID.73).  However, Plaintiff saw Drs. Traylor and Kirouac fairly regularly

throughout 2017 and 2018.  She saw Dr. Traylor in December 2016 and February

2017, saw a different doctor in April 2017, and saw Dr. Kirouac in May and

December 2017, as well as in January, July, October, and November of 2019.

(ECF No. 12-7, PageID.1197, 1200, 1204, 1206-1214, 1218-1225, 1236-1240).

The ALJ found that it "appears that the gaps in follow up examinations arose because the lumbar epidural injections, in addition to the prescribed pain medications, provided significant relief and improved her functioning." (ECF No. 12-2, PageID.73). The ALJ supports this contention with records of reported "80%" and "100%" relief from epidural injections in July 2017 and October 2018. (*Id*.).

However, following the July injection, Plaintiff reported "10/10" pain at her next visit to Dr. Kirouac. (*Id*., PageID.1209). She also underwent epidural injections in December 2017 and January 2018, suggesting that the December injection failed to provide sustained pain relief. (*Id*., PageID.1239-1240). Plaintiff continuously reported severe pain at her doctors' appointments, and told Dr. Gunther on January 23, 2020 that her history of treatment, including injections and pain medications, had failed to decrease her pain. (ECF No. 12-8, PageID.1600). Plaintiff also reported to Dr. Portney in November 2020, that her recent epidural injections had provided less relief. (ECF No. 15-1, PageID.3460). And in her March 2019 visit to Dr. Kirouac, Plaintiff indicated that she had "no significant benefit" from her injection in February of that year. (ECF No. 12-7, PageID.1229).

While the ALJ may not fully credit Plaintiff's reports of pain and lack of relief to her treatment providers, he did not explain why he did not credit her two

statements regarding positive results from injections.  It also appears that he made his own medical justification about the time between Plaintiff's appointments, which, as noted above, were fairly regular.

The ALJ further found that "[t]he large gaps of 3-5 months in follow up examinations is also significant considering the pain medications and muscle relaxers Dr. Kirouac prescribed did not allow for automatic refills, which means the claimant would have to return in the instructed four weeks to obtain medication renewals."  (ECF No. 12-2, PageID.74).  This, the ALJ says, is "confirmed in Dr. Kirouac's October 2018 records."  (*Id*.).  It appears that the ALJ has misread the record here.

Although Dr. Kirouac did indicate that Plaintiff received "no med refill" on 7/20/18, this is because Plaintiff's last prescription was already filled in July 2018 by Dr. Michelle Ritter, as indicated on that same page.  (ECF No. 12-7, PageID.1220).  Further, the ALJ's assessment of large gaps between examinations is inconsistent with the many instances in which Plaintiff had monthly or bi-monthly examinations.  (*Id*., PageID.1218-1235 (documenting visits in October 2018, November 2018, February 2019, March 2019, May 2019, and August 2019)).  Additionally, Plaintiff often received epidural injections from Dr. Kirouac in between those visits.  (*Id*., PageID.1242-1246 (documenting injections in November 2018, February 2019, April 2019, June 2019, and August 2019)).

24

Furthermore, as the October 2018 notation suggests, Plaintiff likely received medication refills from other providers, and no documentation is cited to support the claim that Plaintiff did not take her medications daily as prescribed.  Therefore, the ALJ's conclusion that Plaintiff's reported pain levels can be attributed to "the fact that she had run out of her medications prior to most of her follow up examinations" is not supported by substantial evidence.  (ECF No. 12-2, PageID.74).

The ALJ also placed weight on Plaintiff's medications, which were reported as "only Motrin and gabapentin."  (*Id.*).  This comes from the record of her November 2018 visit to Dr. Kirouac.  However, on previous visits Plaintiff was prescribed tramadol in conjunction with the two other drugs, (ECF No. 12-7, PageID.1200); later, the tramadol was discontinued and her dose of gabapentin increased, (*Id.*, PageID.1204).  Plaintiff was at one point prescribed valium, (*Id.*, PageID.1211), later had her gabapentin dose increased again to 800 mg three times daily, (*Id.*, PageID.1218), and in May 2019 was re-prescribed tramadol, while her gabapentin dose remained at 800 mg, (*Id.*, PageID.1232).  Further, in May 2019, Plaintiff indicated that she was taking more pills than usual because her pain was unchanged.  (*Id.*, PageID.1232).  She also stated that her April 2019 epidural injection provided "no pain relief" and that the pain was worse afterwards.  (*Id.*).  Eventually, Plaintiff presented with "severe progressive back pain that was

25

intractable to conservative treatment" and underwent spinal fusion surgery on October 14, 2019. (*Id.*, PageID.1153). The ALJ did not square his conclusion that "the prescribed treatments provided the claimant adequate relief" with the reality that Plaintiff had complained of back consistently for almost three years, and eventually underwent spinal surgery due to the reported failure of these more conservative treatments. (ECF No. 12-2, PageID.75).

The ALJ separately assessed Plaintiff's RFC post-surgery, finding that "the clinical treatment records show greater abnormal objective findings that support greater exertional limitations." (*Id.*, PageID.77). He also found that

> [p]hysical examinations since the established onset date of disability initially evidenced normal gait, negative straight leg raises, no paraspinal or SI tenderness to palpation, normal reflexes, and full strength in all extremities, but [Plaintiff] also exhibited positive Spurling's signs, positive Hoffman's sign on the right, 4-/5 weakness in the right upper extremity, positive Tinel's sign, positive Phalen's sign, tenderness to palpation of the lumbar paraspinals, limited abduction in the bilateral lower extremities with painful arc, abnormal gait, 4/5 weakness of the bilateral lower extremity, weakness with right lower extremity plantar flexion, slight discomfort on palpation of the trapezius muscles, crepitus of the knees with knee motion, and obese weight.

(*Id.*).

Counter to the ALJ's assertion that Plaintiff had normal reflexes, her reflexes were found to be limited by Dr. Eltahawy in January 2020, (ECF No. 15-1, PageID.3222). Later that month, her reflexes were again found to be limited when she presented for physical therapy. (*Id.*, PageID.3490-3491). When Plaintiff

was next seen in May 2020, Dr. Craib again found limited reflexes, as well as an antalgic gait and use of a cane.  (ECF No. 12-11, PageID.2693).[7]  Plaintiff was then seen in September 2020 by Dr. Kucera, who again noted limited reflexes. (*Id.*, PageID.2665).  And in November 2020, Dr. Portney noted limited reflexes on examination as well.  (ECF No. 15-1, PageID.3462).

In taking account the evidence post-surgery, the ALJ found Plaintiff to be more limited by her back, requiring sedentary work instead of the light work he assessed for the pre-surgery period.  (ECF No. 12-2, PageID.78).  However, despite noting a positive Tinel's sign and Phalen's test in addition to weakness in Plaintiff's right arm, the ALJ found that Plaintiff's post-surgery records did not warrant a change to her prior manipulative functional limitations.  (*Id.*, PageID.77-78).  He explained that this was due to records indicating that while Plaintiff "had difficulty holding a phone in writing with her right hand," she had "good grip strength and greater pinch strength in her right versus left hand" in June 2020, and "full grip strength [with] good ability to make a fist, good range of motion of the wrists, elbows and shoulders, and no synovitis in the PIP and MCP joints" in November 2020.  (*Id.*, PageID.78).

While the ALJ noted earlier in his opinion that Plaintiff wore bilateral wrist

---

[7] Plaintiff saw Dr. Craib again in June 2020, but as noted above, she did not examine Plaintiff's reflexes on that visit as Dr. Craib was focused on Plaintiff's carpal tunnel syndrome.  (ECF No. 12-11, PageID.2683-2685).

splints at night in January 2020, Plaintiff points out that she began wearing her right splint twenty-four hours a day in May 2022. (ECF No. 16, PageID.3518 (citing ECF No. 15-1, PageID.3438)). This was not addressed by the ALJ or rebutted by the Commissioner. The ALJ also failed to consider Plaintiff's EMG in June 2020, which revealed moderate right and mild left median mononeuropathy at the wrists consistent with carpal tunnel syndrome. (ECF No. 12-10, PageID.2615). This was despite the fact that Plaintiff also testified about having an EMG that showed moderate carpal tunnel syndrome. (ECF No. 12-2, PageID.108-109). The Commissioner failed to address this as well. *See, e.g.*, ECF No. 20, PageID.3569.

In June 2020, during a visit to Dr. Craib, Plaintiff had "[s]lightly decreased grip strength" of the right hand. (ECF No. 12-10, PageID.2685). She was also treated consistently for grip and pinch weakness at occupational therapy, greater on the right side than the left. (ECF No. 15-1, PageID.3276-3442). This encompasses eight visits to occupational therapy in May and June of 2020. (*Id*.). In September 2020, Plaintiff saw Dr. Kucera, complaining of numbness and tingling in her fingers. (*Id*., PageID.2662). Dr. Kucera found positive Tinel's signs and a positive Phalen's Test, but no thenar atrophy. (*Id*., PageID.2665). Her arm and hand strength was not tested. Plaintiff did exhibit full grip strength in the upper extremities at her visit with Dr. Portney in November 2020, whom she saw for a back pain assessment. (*Id*., PageID.3462).

28

4.      Analysis

As discussed above, the ALJ largely focused on the fact that Plaintiff did not see a doctor consistently every month from December 2016 to December 2020, leading to the unwarranted and speculative conclusion that Plaintiff was not fully compliant with her medications, a finding not present in any medical record cited in his decision.  Regarding Plaintiff's epidural injections, the ALJ has highlighted two instances where Plaintiff reported pain cessation, with no reference to the multiple records indicating that many of her injections failed to achieve meaningful pain relief.  The ALJ also did not account for Plaintiff's full history with regard to prescription medications; instead, he relied on only one record that indicated Plaintiff took only gabapentin and Motrin for pain.  The ALJ failed to mention the increases in her gabapentin dosage or the fact that tramadol was later added to her list of medications.

Post-surgery, the ALJ stated that Plaintiff had normal reflexes, when in fact the medical record consistently notes limited reflexes during this timeframe. Furthermore, he failed to adequately explain why Plaintiff's manipulative limitations should not be adjusted, relying on two records that indicated full upper extremity strength but failing to square this finding with multiple records indicating positive signs and tests indicating carpal tunnel syndrome, decreased strength in both extremities but more so on the right, and consistent complaints of

numbness and tingling in Plaintiff's hands and fingers. The ALJ also failed to consider that Plaintiff began wearing her right wrist splint at all hours of the day and that a June 2020 EMG indicated moderate right and mild left median mononeuropathy at the wrists consistent with carpal tunnel syndrome. Plaintiff raised these issues in her brief, but the Commissioner failed to address them.

The Commissioner argues that the ALJ not required to address every piece of evidence directly in order to show his consideration of it. (ECF No. 20, PageID.3566 (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006)). This is true, but only where "his factual findings as a whole show that he implicitly resolved such conflicts [in evidence]." *Kornecky*, 167 F. App'x at 508 (citation omitted). The Sixth Circuit has also stated that "an ALJ must include a discussion of 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record.' " *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (quoting 5 U.S.C. § 557(c)(3)(A)). This "is both a procedural and substantive requirement, necessary in order to facilitate effective and meaningful judicial review." *Id*. By not referencing or explaining the consideration of medical evidence that supports Dr. Gunther's opinion, "the ALJ has prevented the Court from being able to conduct a meaningful review to determine whether substantial evidence supports his decision." *Felix F. v. Comm'r of Soc. Sec. Admin.*, No. 2:22-CV-2092, 2023 WL

4745612, at *8 (S.D. Ohio July 25, 2023) (citing *Reynolds*, 424 F. App'x at 414).

"[T]he measuring stick for an 'adequate discussion' is whether the ALJ's persuasiveness explanation enables the court to undertake a meaningful review of his finding as to whether the particular medical opinion was supported by substantial evidence." *LaBona v. Kijakazi*, No. CV 5:23-035-DCR, 2023 WL 4274948, at *3 (E.D. Ky. June 29, 2023) (quoting *Terhune v. Kijakazi*, No. CV 3:21-37-KKC, 2022 WL 2910002, at *3 (E.D. Ky. July 22, 2022) (citing *Blakley*, 581 F.3d at 409)).

Here, the ALJ found Dr. Gunther's opinion to be "not persuasive, because the objective physical findings and prescribed treatments in his clinical records generally do not support the severe exertional, postural, reaching and manipulative limitations, off task behavior, and absences he opined." (ECF No. 12-2, PageID.76). "Additionally, [Dr. Gunther's] assessment of [Plaintiff's] physical capacity is not consistent with the hospital and other clinical records that are discussed and cited above." (*Id*.). The ALJ agreed with Dr. Gunther that Plaintiff could only sit for two hours, but found insufficient evidence to support the need for a sit/stand option prior to Plaintiff's spinal fusion surgery. (*Id*.). The ALJ also disputed Dr. Gunther's other functional limitations, but did not discuss Dr. Gunther's conclusion that Plaintiff could only stand for one hour and walk for one hour during the workday. (*Id*.).

Regarding the time after Plaintiff's surgery, the ALJ once again found Dr. Gunther's opinion unpersuasive. (*Id*., PageID.79). The ALJ found that a reduction to sedentary work was warranted as well as a sit/stand option, but not the sit/stand option *at will* that Dr. Gunther assessed. (*Id*.). The ALJ also rejected Dr. Gunther's opinion regarding off task behavior, absences, and functional limitations other than those incorporated into the RFC. (*Id*.).

As explained above, the ALJ's assessment of the medical record contains several errors. As such, the ALJ's generic references to his prior discussion do not support his consideration of Dr. Gunther's opinion. The regulations state that "supportability" and "consistency" are the most important factors in evaluating a medical opinion and must be explained. 20 C.F.R. § 404.1520c(b)(2). Here, the ALJ attempted to incorporate his prior discussion of the evidence as that explanation, but due to the deficiencies in his consideration of the evidence, that explanation was inadequate. Furthermore, the ALJ did not discuss any other factors in his persuasiveness finding, which include but are not limited to the treater's relationship with the claimant and the treater's specialization. 20 C.F.R. § 404.1520c(c). Discussion of these factors is only required when the ALJ finds that "two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported . . . and consistent with the record." 20 C.F.R. § 404.1520c(b)(3). While discussion of these factors was not required, they

32

were still required to be considered by the ALJ.  20 C.F.R. § 404.1520c(c).

Due to the inadequate consideration of the supportability and consistency factors regarding Dr. Gunther's opinion, combined with the lack of discussion regarding the other factors, effective and meaningful review of the ALJ's decision by the Court is foreclosed.  *See* *Reynolds*.  Moreover, if the evidence had been properly considered, the ALJ may have found that Dr. Gunther's opinion was equally or more supported and consistent with the record.  Therefore, a remand is warranted in order for the ALJ to conduct a thorough examination of the medical record and properly evaluate Dr. Gunther's treating source opinion.  The issues highlighted above also directly affect the accuracy of the RFC, which must also be reconsidered on remand.

### B.     Other Arguments

Plaintiff has presented other arguments for remand regarding additional reasons the RFC should be rejected; the ALJ's Step Four finding; and the removability of the Commissioner.  A remand is not warranted for any of these reasons, as explained below.

### 1.     Plaintiff's Muscle Wasting and Cane Usage

Plaintiff argues that the medical record indicates Thenar muscle wasting or atrophy, which was not considered by the ALJ.  (ECF No. 16, PageID.3524).  Specifically, Dr. Craib noted that Plaintiff had mild muscle wasting in the right

Thenar eminence on May 20, 2020.  (ECF No. 12-11, PageID.2690).  Plaintiff

argues that thenar muscle wasting is "a sign of severe and prolonged median

compression" and, in some opinions, an "absolute indication for surgery."  (ECF

No. 16, PageID.3524).  However, in Plaintiff's subsequent visit to Dr. Craib on

June 17, 2020, she found full Thenar eminence (i.e., no atrophy), and on

September 28, 2020, Dr. Kucera found no Thenar atrophy as well.  (ECF No. 12-

11, PageID.2665, 2685).

The ALJ did not discuss these findings, but as noted above, the ALJ need

not discuss every medical report to show that it was considered.  *Kornecky*, 167 F.

App'x at 508.  This could be considered harmless error, at most.  *See Rabbers v.

Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally,

however, we review decisions of administrative agencies for harmless error.").

Furthermore, an impairment is only considered disabling if it "has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A).  Thus, lack of consideration of one record indicating Thenar muscle

atrophy would not alone change the ALJ's conclusion where subsequent records a

few months later indicate there is no such atrophy.

Similarly, Plaintiff notes that while the ALJ stated only one medical record

indicated Plaintiff's use of a cane post-surgery, (ECF No. 12-2, PageID.78-79),

there are actually three records stating such, dating from January 2020 to May

34

2020, (ECF No. 12-8, PageID.1604; ECF No. 12-11, PageID.2691; ECF No. 15-1, PageID.3222).  But in June 2020, Dr. Craib indicated that Plaintiff was no longer using a cane to ambulate.  (ECF No. 12-10, PageID.2683).  No records post-dating that visit evidenced use of a cane.  Thus, this condition would not contribute to Plaintiff's disability, as it did not last for longer than 12 months.  Additionally, while requiring use of a cane generally affects a claimant's ability to do light work, where a claimant is assessed a sedentary work restriction, as Plaintiff was post-surgery, an ALJ's failure to take cane usage into consideration is harmless error. *See Johns v. Comm'r of Soc. Sec*, No. 2:20-CV-12271, 2022 WL 454281, at *7 (E.D. Mich. Jan. 26, 2022), *report and recommendation adopted*, 2022 WL 447058 (E.D. Mich. Feb. 14, 2022); *Jozlin v. Comm'r of Soc. Sec.*, No. 12-CV-10999, 2013 WL 951034, at *9 (E.D. Mich. Mar. 12, 2013).  Thus, the ALJ's explanation regarding Plaintiff's cane is not reason for remand.

### 2.     Step Four Finding

At Step Four, the ALJ found that Plaintiff was and continued to be capable of performing her past relevant work as a scheduler, work that did not require the performance of activities precluded by her RFC at the light or sedentary exertional levels.  (ECF No. 12-2, PageID.79).  Plaintiff argues that this was error because the ALJ failed to consider the reality of her past relevant work, which was a composite job consisting of scheduling and delivering.  (ECF No. 16, PageID.3525).  This

information stems from Plaintiff's testimony, in which she describes the job as requiring driving and lifting boxes approximately once per week. (ECF No. 12-2, PageID.94-95). The ALJ acknowledged that the composite job as described by Plaintiff would be outside of her RFC, due to its driving requirements. (ECF No. 12-2, PageID.116-117).

The ALJ later reconsidered his classification of Plaintiff's past work as a composite job, noting that in Plaintiff's typed disability application, she noted her past work as a "scheduler" and did not indicate that she lifted or carried supplies or was required to drive. (*Id.*, PageID.80). The ALJ then provided the vocational expert interrogatories in order to supplement her testimony regarding Plaintiff's past work. (*Id.*, PageID.81). The expert indicated that Plaintiff's past work as a scheduler would not be precluded by the assessed RFC. (*Id.*). Therefore, the ALJ considered Plaintiff to be not disabled, as she would be able to perform her past relevant work. (*Id.*).

Here, the ALJ was tasked with resolving discrepancies within the record. He found that Plaintiff's disability application indicated that she had at some point performed the work of scheduler alone, not as a composite job that included driving. Resolving such discrepancies is the ALJ's prerogative. *See Richardson v. Perales*, 402 U.S. 389, 399-400 (1971). As such, the ALJ did not err in the manner in which he resolved Plaintiff's job description.

3.      Unconstitutionality Based on Removability of Commissioner

Plaintiff argues that at the time of the ALJ's decision, the SSA was

structured unconstitutionally, requiring remand of this matter to an ALJ that will

have been validly appointed.  Specifically, at the time of the decision, Andrew Saul

(then Commissioner of Social Security) could only be removed from office

"pursuant to a finding by the President of neglect of duty or malfeasance in

office[,]" or as Plaintiff puts it, "for cause."  (ECF No. 16, PageID.3531 (quoting

42 U.S.C. § 902(a)(3)).

The Supreme Court has recently issued two decisions about other federal

agencies with similar structures, finding that similar "for cause" requirements for

removal of the heads of those agencies violated constitutional separation of

powers.  *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 207 L. Ed. 2d 494, 140 S.

Ct. 2183 (2020); *Collins v. Yellen*, 210 L. Ed. 2d 432, 141 S. Ct. 1761 (2021).

The Commissioner agrees that the law in place at the time of the ALJ's

decision regarding removal of the Commissioner position was unconstitutional.

(ECF No. 20, PageID.3545).  However, the Commissioner argues that the

unconstitutionality of the SSA's structure does not warrant the remand of any ALJ

decision made during that time, absent unique circumstances.  That is because

under these circumstances, a plaintiff cannot obtain retrospective relief without

showing that the unconstitutional provision itself inflicted compensable harm to

37

Plaintiff.  *Collins*, 141 S. Ct. at 1789.

Plaintiff is correct that the Court need not decide this issue, because under the doctrine of constitutional avoidance, constitutional questions need not be reached when remand is warranted for other reasons.  *See Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347 (1936).  Here, because the case will be remanded for reconsideration of Dr. Gunther's treating source opinion, it is not necessary to address this constitutional question.[8]

---

[8] Further, even considering the issue, a remand is not warranted.  Although the Sixth Circuit has not addressed the issue, the Ninth Circuit has held that a Social Security claimant must show that the removal provision in question caused her harm.  *Kaufmann v. Kijakazi*, 32 F.4th 843, 850 (9th Cir. 2022).  Examples of this showing include that the President himself taking an interest in her claim or the Commissioner directing the Appeals Council to deny her claim due to the statutory limits on the President's removal authority.  *Id.*  Plaintiff has not suggested anything similar to that, here.  *See also Collins*, 141 S. Ct. at 1802 (Kagan, J., concurring in part) (opining that "I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone" because "[w]hen an agency decision would not capture a President's attention, his removal authority could not make a difference—and so no injunction should issue.").  Several district courts have reached the same conclusion, as the Commissioner notes.  *See* ECF No. 20, PageID.3550-3552; *see also Boggs v. Kijakazi*, No. 2:21-CV-17-DCP, 2022 WL 4360940, at *4-6 (E.D. Tenn. Sept. 20, 2022); *Stilson v. Comm'r of Soc. Sec,*, No. 5:21-CV-12330, 2022 WL 18399623, at *15 (E.D. Mich. July 19, 2022), *report and recommendation adopted*, 2023 WL 349767 (E.D. Mich. Jan. 20, 2023); *Smith v. Kijakazi*, No. 7:21-cv-5-REW, 2022 WL 2718965, at *8-9 (E.D. Ky. July 13, 2022); *Farmer v. Comm'r of Soc. Sec*., No. 1:20-cv-562, 2022 WL 2526946, at *6-7 (W.D. Mich. July 7, 2022); *Helper v. Kijakazi*, No. 21-1130-TMP, 2022 WL 1568742, at *8 (W.D. Tenn. May 18, 2022); *Colbert v. Comm'r of Soc. Sec*., No. 5:20-CV-2234, 2022 WL 556738, at *2 (N.D. Ohio Feb. 24, 2022).

VI.    Conclusion

For the reasons stated above, Plaintiff's motion for summary judgment, (ECF No. 16), is GRANTED; the Commissioner's motion for summary judgment, (ECF No. 20), is DENIED; and the case is REMANDED for further proceedings consistent with this Opinion.

SO ORDERED.

Dated: August 10, 2023                    s/Kimberly G. Altman___
Detroit, Michigan                         KIMBERLY G. ALTMAN
                                          United States Magistrate Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 10, 2023.

                                          s/Carolyn Ciesla___
                                          CAROLYN CIESLA
                                          Case Manager